Evelyn M. SEATON and Eugene S. Seaton, Movants,

v.

Theodore ROSENBERG, Respondent.

Supreme Court of Kentucky.

Oct. 31, 1978.

Rehearing Denied Dec. 19, 1978.

Charles A. Williams, Williams, Housman & Sparks, Paducah, Eldred, Paxton & Terry, Princeton, for movants.

Henry O. Whitlow, Threlkeld, Whitlow & Roberts, Paducah, for respondent.

STEPHENSON, Justice.

The questions presented on this appeal are the propriety of remarks of the trial court on the testimony of the medical expert testifying for the movant and the ruling on hypothetical questions propounded to the medical expert. The trial court entered judgment on a jury verdict for the respondent, Dr. Theodore Rosenberg, and the Court of Appeals affirmed. We granted discretionary review and reverse for a new trial.

Evelyn Seaton, a 49-year-old registered nurse in normal physical condition, was the patient undergoing a surgical procedure for a gallbladder condition. Dr. Theodore Rosenberg was the anesthesiologist. The surgical procedure commenced about 8 a. m. Two or two and one-half hours afterwards and at a time the procedure was almost completed, the surgical assistant who had her hand against the aorta told the surgeon she did not feel a pulse. At about the same time, Dr. Rosenberg also advised the surgeon that he did not feel a pulse. The surgeon (by discovery deposition) testified he placed his hand on the heart and did not feel a beat. Emergency procedures were then undertaken with Dr. Rosenberg ventilating and administering pure oxygen, drugs, etc. from a cardiac arrest kit to stimulate the heart and restore normal blood pressure. The surgeon massaged the heart internally through the diaphragm, and another doctor massaged the heart externally. According to the surgeon, the heart responded almost immediately and quickly resumed normal beat. From one set of notes he estimated one and one-half to two minutes had elapsed. From notes he made later, he estimated two to three minutes. Understandably he could not fix an exact time. Dr. Rosenberg (by discovery

deposition) testified that the time lapse before the heart resumed beating regularly was two minutes. The nurse's notes showed cardiac arrest at 10:25 a. m., resumption of normal beat at 10:30 a. m. Later it developed that as a result of lack of oxygen going to the brain, Evelyn Seaton suffered permanent brain damage leaving her partially blind, spastic and unable to care for herself. There is no claim the surgeon acted other than in accordance with the proper standard of care throughout the surgical procedure and emergency measures that followed. The surgeon testified that everything was normal from his viewpoint until notified that there was no pulse.

Dr. Rosenberg testified that Evelyn Seaton's brain damage resulted from a lack of oxygen due to the cardiac arrest and that according to medical literature if the brain is deprived of oxygen for a period of four to six minutes brain damage results. The surgeon declined to be unequivocal on this point, testifying that depending on the individual a shorter or longer period of time would be required.

According to the medical testimony there is always the danger of cardiac arrest (the heart stops beating) with the use of anesthetic agents such as were used in this procedure. This always present danger requires careful observation and monitoring of the gases used, pulse, blood pressure and use of a "bag" to ventilate, all of this is the responsibility of the anesthesiologist.

Dr. Rosenberg testified that during the course of the operation he checked the blood pressure at least every five minutes and the pulse at least every two minutes and at the same time kept one hand on the "bag" to assist in breathing.

He further testified that as a part of his regular duties he kept a chart checking blood pressure and pulse as taken and there were no signs that Evelyn Seaton was experiencing any difficulty until he failed to detect a pulse. He testified that he constantly monitored the anesthetic agents, that they were normal and expressed the opinion that the cardiac arrest just happened and could not account for any causative factor.

Some ten months later, Dr. Rosenberg was notified that Evelyn Seaton's lawyer desired to examine the hospital records of the operation. He then proceeded to the hospital record room and began adding to the chart he kept during the operation until advised by a record room clerk that this was improper. When questioned about the chart as added to and introduced into evidence, Dr. Rosenberg testified in part:

"Some of these marks are accurate and were put on the day of the procedure. I don't know which ones they were . . .

"Q. How far had you gotten along, Doctor, when the nurse stopped you or the record personnel stopped you?

"A. I don't know. I was so flustered. I thought maybe Charlie, or Mr. Williams will misunderstand me. I was so, for a better word, shook I didn't know where I quit and I handed it to them. I have no idea. If I had known, I would have erased them. No, I wouldn't have done that. I will say this. I would not have erased this because that is immoral."

This anesthesiologist chart, which, when checked, shows the patient's blood pressure and pulse as noted during the course of the operation, precipitated the difficulty in the trial of this case.

The Seatons introduced as an expert medical witness Dr. Jan Hasbrouck, a practicing anesthesiologist and Chief of Anesthesiology for the University of Kentucky. Dr. Hasbrouck testified to his qualifications and further testified that prior to trial he had read the depositions of Dr. Rosenberg, the surgeon and the nurses, and that he also had examined the hospital record of the operation including the anesthesiologist chart.

Then in very brief summary, Dr. Hasbrouck testified that in his opinion, because of the problem inherent in gallbladder surgery involving the upper abdomen, the patient had not been properly ventilated (assisted in breathing); that in his opinion the

heart probably never entirely stopped, but beat weakly with the result that it became an ineffective pump in transmitting blood and oxygen to the brain; that this condition if sustained over a period of time would lead in sequence to cardiovascular collapse, cardiac arrest and death; that instant cardiac arrest is so rare as to not be reportable; that there are signs of this impending condition revealed by dropping blood pressure and pulse, etc., and that these indications should be apparent to the anesthesiologist; further, that the injury to Evelyn Seaton resulted from lack of oxygen to the brain and that a period of one and one-half to two minutes of no circulation would not produce Evelyn Seaton's condition. He further testified that the anesthesiological chart kept by Dr. Rosenberg was too regular to be believable in that up to the point of the cardiac arrest it showed no change in blood pressure and that by the very nature of the procedures followed there would be changes.

It was this portion of the testimony that triggered what we believe to be reversible error in the trial of this case without regard to other trial errors which will be discussed later.

Movant's counsel was exploring the signs which Dr. Hasbrouck regarded as indicating the impending emergency in this operation and asked:

"38   And if there was a slowing of the heart or the circulation to the point that it stopped or it ceased beating to such an extent that it ceased to furnish oxygen to the brain, would there, or not, have been some indication of that in the blood pressure and in the pulse?

"A.   Yes, I think so.

"MR. WHITLOW: We object, your Honor, to this line of questioning. The indications are that the blood pressure did not drop until the cardiac arrest, and he is assuming that they didn't even have any cardiac arrest.

"MR. WILLIAMS: No, sir. The indications are that the Doctor changed the record and the record is—

"COURT: Well, changing the record may be wrong but it hasn't been shown what he changed them from, he just changed them to something. I don't think the—although the procedure Dr. Rosenberg himself admits was unfortunate in that he did change the record but I don't think changing the record is material in determining the cause of the cardiac heart arrest, if that's what you are trying to show.

"MR. WILLIAMS: Well, we object to that, and certainly I think it's very material.

"COURT: I'm talking about the cause of it.

"MR. WILLIAMS: Well, I'm talking about the cause of it, too. I think it's certainly very material as to what can we believe about what Dr. Rosenberg says.

"COURT: Changing the record is not going to tell you anything, except the record was changed, and they weren't changed, they were added to. He said he didn't erase anything. He just didn't note them at the time. I think perhaps 'change' is not the correct word that should be used in regard to the record.

"MR. WILLIAMS: Well, if he added to it, he changed it. It is certainly different from what it was when he left it.

"COURT: He added to it, but he says that he didn't change anything that was on there at the time.

"MR. WILLIAMS: Well, he says he doesn't know what was on there at the time.

"COURT: Well, all right, we can argue that point, I guess, for the rest of the afternoon but we are not going to. Now, what is your question?"

Before commenting on these remarks, let us place this trial in the proper perspective.

Evelyn Seaton suffered massive, disabling brain damage. The brain damage was a result of lack of sufficient oxygen to the brain for a period of time sufficient to cause the damage.

The Seatons' theory of the case as presented by their expert witness is that sudden cardiac arrest does not happen; that probably the heart for a period of time was beating weakly so as to make it an inefficient pump; and that whether at the time lack of pulse was first noticed the heart was still beating very weakly or had stopped, there are indications of this condition prior to a crisis that should be apparent to the anesthesiologist and that the anesthesiologist should recognize these indications, or signs, and take remedial measures which will avert the emergency of cardiac arrest. That the failure to recognize these signs and apply remedial procedures breached his duty to the patient.

Dr. Rosenberg's theory of the case is that the cardiac arrest was sudden with no advanced warning by signs indicating the impending cardiac arrest and that there was no breach of a duty owed the patient.

■ Dr. Rosenberg was under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs (here anesthesiologist) acting in the same or similar circumstances. *Blair v. Eblen*, Ky., 461 S.W.2d 370 (1970). This is the standard of care placed upon Dr. Rosenberg here, and whether this standard was violated is the ultimate issue presented to the jury.

■ Here the anesthesiologist chart was in evidence with the circumstances of the additions to the chart by Dr. Rosenberg and his explanation. Dr. Hasbrouck testified that the chart was too regular to be believed, that fluctuations in blood pressure inevitably occurred. Dr. Rosenberg had testified that he would have noted any abnormal blood pressure readings. The Seatons were entitled to have this evidence before the jury without any prejudicial comments by the trial court. In our opinion the remarks of the trial court at the least diluted the effect of this evidence and at most effectively removed this evidence from consideration by the jury. The resulting prejudice is, in our view, sufficient to reverse this case.

It is not for us to draw inferences from this unusual conduct. The jury was entitled to place great significance, or no significance at all, or all the gradations in between, on the additions; and it is improper for the trial court to advise the jury, as was done here, that the changes were not material in determining the cause of the cardiac arrest. This misses the point, and, in effect, directs the jury not to consider Dr. Rosenberg's conduct in this respect at all.

■ Also during the course of examining this witness there was a frivolous objection to a proper question as to Dr. Hasbrouck's opinion on maintaining proper vigilance. The trial court again interjected what we consider to be an irrelevant issue and prejudicial comment into this trial. Somehow the trial court conceived the idea that the issue in the case was whether the heart had, in fact, stopped completely. A fair reading of Dr. Hasbrouck's testimony is that he was of the opinion the heart never stopped completely but was beating so weakly that it would be difficult to ascertain if it had stopped. But in any event whether the heart stopped or was beating weakly, he expressed the same opinion as to indications and vigilance. The trial court remarked that "he [Dr. Hasbrouck] could not speculate on something unless he was there"; "he wasn't there"; "he can guess." Excluding this opinion from evidence was erroneous and coupled with comments on the evidence was prejudicial. There were other instances of excluding proper opinion evidence from the jury with remarks of "assumptions."

■ We do not propose to unravel all the problems concerning hypothetical questions here except to say that the trial court fell into the error of taking the view that an assumed fact had to be based on the oral testimony of the persons present in the operating room, with prejudicial remarks such as: "Court: I don't think we can say under these circumstances that there is any testimony to contradict what Dr. Rosenberg testified in his deposition, which you read." This remark after a statement by Dr. Rosenberg's counsel that all the proof is that

the blood pressure was taken every five minutes or less; then another comment that "obviously you can explain the record by Dr. Rosenberg, but I don't think you can explain the record by this witness, because he knows nothing at all about it, he wasn't there when it was prepared."

Generally we see nothing objectionable to the hypothetical questions posed here; and, for example, on one question we are of the opinion "the assumption of improper ventilation" in a hypothetical question was in evidence as a fact testified to by Dr. Hasbrouck as to an opinion based upon the record, and it was proper to state if the result of such caused the damage here.

▪ This case must be tried again, and for the purposes of this retrial we point out that Dr. Hasbrouck, prior to trial, read all the discovery depositions and the hospital records. Thus, Dr. Hasbrouck was in possession of all the requisite facts and may express his opinion and the reasons for his opinion in response to direct interrogation and need not be asked hypothetical questions. See 56 A.L.R.3d 300, Expert Witnesses-Hypothetical Questions, at p. 308. 31 Am.Jur.2d, Expert and Opinion Evidence, § 37, at p. 539 states:

"If an expert witness is acquainted with the facts of the case—that is, if he has personal knowledge or has made personal observation—he may give his opinion upon the basis of his knowledge and observation in response to direct interrogation and without a hypothetical question, provided he is shown to have sufficient knowledge of the facts to enable him to form an opinion entitled to be given weight by the jury and, as a rule, provided the witness first testifies to the facts in his own knowledge upon which his opinion is based. On the other hand, an expert is not precluded from giving his opinion in answer to a hypothetical question merely because he has personal knowledge of the case and might testify directly. Even though an expert witness has actual knowledge of the facts in controversy, he may give his opinion based on hypothetical facts alone or upon such facts together with facts within his own knowledge. Thus, where the expert has testified to his own observations, he is generally permitted to state his opinion, based partly on facts stated in a hypothetical question and partly on those which he himself has testified to. Whether the expert's opinion should be based upon facts known and testified to by him, or upon a hypothetical presentation of facts testified to by other witnesses, or upon both forms of data, is determined by examining counsel."

The necessity of hypothetical questions is to inform the expert of relevant facts in testimony in order to elicit his opinion. The reason for hypothetical questions is not present here and should facilitate retrial.

▪ One last caution, the expert expresses his opinion as a probability or certainty, not a possibility, "could have," or the like.

The case is reversed with directions that the Seatons be granted a new trial.

All concur.