NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0442n.06

No. 16-6143

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOROTHY MAE JOHNSON, et al., | ) | **FILED** |
| | ) | Jul 27, 2017 |
| Plaintiffs-Appellants, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MEMPHIS LIGHT GAS & WATER DIVISION, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, BATCHELDER, and STRANCH, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

In this wrongful death action against Defendant-Appellee Memphis Light Gas & Water Division (MLGW), Plaintiffs-Appellants Dorothy Mae Johnson and Lois Towns—respectively wife and sister of the decedent, J. Dean Johnson—appeal the district court's order excluding their expert witness, Miguel A. Laboy, M.D., and its resultant order granting Defendant's motion for summary judgment. For the reasons stated below, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## I.

## A.

This Court provided a detailed account of the facts of this case in a prior appeal. *See Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 840-42 (6th Cir. 2015). Briefly, in 2010, Mr. Johnson was denied public utility services by Defendant for his new apartment

because Defendant insisted that he produce a state-issued photo identification, which he could not obtain. *Id.* Consequently, he lived without utilities for eighteen months, and on August 4, 2011, Mr. Johnson died in his apartment, allegedly of heat stroke. *Id.* at 840. Investigators determined that the internal temperature of the apartment was 93.2 degrees Fahrenheit, with 63 percent humidity. R. 111-4, PageID 1661.

An autopsy report was prepared Dr. Miguel Laboy, M.D. *Id.* at PageID 1657. Dr. Laboy is an assistant medical examiner for the West Tennessee Regional Forensic Center.[1] R. 130-2, PageID 1969. In this capacity, he is charged with determining the cause and manner of death for sudden, unexpected, or violent deaths in Shelby County, Tennessee, and the surrounding counties. *Id.*; R. 112-1, PageID 1703, 1705; Tenn. Code. Ann. 38-7-109. Accordingly, Tennessee courts must receive his autopsy reports as competent evidence. Tenn. Code. Ann. 38-7-110(a). He is licensed to practice medicine in Missouri, Tennessee, and Mississippi. R. 130-2, PageID 1970. He is certified by the American Board of Pathology[2] in Anatomic Pathology[3] and Forensic Pathology[4]. *Id.* Dr. Laboy performs four to seven autopsies per working day, and works two to three days per week. *Id.* at PageID 1706-07.

On August 5, 2011, Dr. Laboy performed the autopsy on Mr. Johnson's body. R. 111-4, PageID 1657. That same day, Dr. Laboy prepared the preliminary autopsy report and pending death certificate. R. 112-1, PageID 1742-43. In conducting the autopsy, Dr. Laboy first

---

[1] To be eligible to be a county medical examiner in Tennessee, one must be licensed in Tennessee as either a doctor of medicine (M.D.) or a doctor of osteopathy (D.O.). Tenn. Code Ann. 38-7-104(a).

[2] "Pathology" is "that branch of medicine which treats of the essential nature of disease, especially of the structural and functional changes in tissues and organs of the body which cause or are caused by disease." Dorland's Illustrated Medical Dictionary 1148 (25th ed.1974).

[3] "Anatomic Pathology" is "the subspecialty of pathology that pertains to the gross and microscopic study of organs and tissues removed for biopsy or during post mortem examination, and also the interpretation of the results of such study." Steadman's Medical Dictionary ¶ 662110, Westlaw (database updated Nov. 2014).

[4] "Forensic Pathology" is "that subspecialty which is concerned with the cause and manner of death for legal or public purposes." Ray Taylor, et al., *Forensic Pathology in Homicide Cases*, 40 Am. Jur. Trials 501, § 6 (2017).

performed an exterior examination of Mr. Johnson's body, which revealed no evidence of trauma. R. 111-4, PageID 1658.

Dr. Laboy then conducted an internal examination. Dr. Laboy found that Mr. Johnson's head was medically normal, and was free from injury. *Id.* at PageID 1659. Aside from some decomposition, Mr. Johnson's neck was healthy, and Dr. Laboy found no obstructions or trauma. *Id.* Similarly, Mr. Johnson's chest and abdomen, gastrointestinal tract, liver and gallbladder, spleen, pancreas, adrenal glands, urinary tract, reproductive system, and musculoskeletal system all revealed no abnormalities and no trauma. *Id.* at PageID 1659-61. However, Dr. Laboy did find that Mr. Johnson's lungs were congested. *Id.* at 1659. In examining the heart, Dr. Laboy found signs of mild coronary artery disease, and noted that both its weight and the thickness of its walls were within the normal limits. *Id.*

After conducting this exterior and interior examination of Mr. Johnson, and running a preliminary toxicology panel (which turned up negative), Dr. Laboy provisionally concluded, "In my opinion, this death resulted from probable heat stroke. The manner of death is accident." *Id.* PageID 1661; *see also* R. 112-1, PageID 1742-43.

On August 9, 2011, Dr. Laboy received from Dr. Geater, Mr. Johnson's primary care physician, the medical records that she had on file for Mr. Johnson. R. 112-1, PageID 1782-83. On August 15, 2011, Dr. Laboy received the final toxicology report, which was negative. R. 72-3, PageID 1135-37. Lastly, on August 19, 2011, Dr. Laboy received the lab's report showing vitreous electrolyte levels consistent with profuse sweating from extreme heat. *Id.* at 1132-34; R. 112-1, PageID 1761. The same day, after reviewing all of these records, Dr. Laboy signed the delayed and final death certificate, and reaffirmed his preliminary diagnosis of "probable heat stroke" as the cause of death. *Id.* at PageID 1743, 1760-61, 1782-83.

**B.**

Plaintiffs sued MLGW in the Circuit Court of Shelby County, Tennessee, claiming violations pursuant to 42 U.S.C. § 1983, the Government Tort Liability Act, Tenn. Code. Ann. § 29-20-205 *et seq.*, and Tennessee's wrongful death statute, Tenn. Code Ann. § 20-5-106 *et seq.* MLGW removed the case to federal district court on the basis of federal question and supplemental jurisdiction, and moved for summary judgment on statute of limitations grounds. *Johnson*, 777 F.3d at 842. The district court granted Defendant's motion. *Id.* However, we reversed and remanded for further proceedings on the merits. *Id.* at 840.

Meanwhile, during discovery, Plaintiffs disclosed Dr. Laboy as their sole expert witness. R. 111-1, PageID 1632-33. The disclosure stated that Dr. Laboy would

> testify along the lines of his report that J. Dean Johnson's cause of death resulted from probable heat stroke due to the fact that he was inside his secured apartment, which did not have any utilities and the temperature in the bedroom was 93.2 degrees, with 63% humidity, and that the manner of his death is accident. He will also testify that Plaintiff J. Dean Johnson had no significant past medical history.

*Id.* Dr. Laboy was deposed on January 29, 2014, and testified that it was his professional opinion—as a medical examiner and pathologist—that the cause of death was probable heat stroke. R. 112-1, PageID 1809.

Following remand from this Court, MLGW moved to exclude Dr. Laboy's testimony pursuant to Fed. R. Evid. 702. R. 111. Specifically, Defendant contended that Dr. Laboy's testimony should be excluded because: (1) it was not expressed to the requisite degree of medical certainty; (2) it would not assist the jury in understanding the evidence or in determining a fact in issue; and (3) it was unreliable because Dr. Laboy's methodology was flawed, in that it did not consider alternative causes of death. R. 119, PageID 1829. Plaintiffs failed to respond, and the district court granted Defendant's motion. R. 119, PageID 1828.

The district court agreed with Defendant. First, it held that Dr. Laboy's opinion that Mr. Johnson's death resulted from "probable heat stroke" did not meet the standard for admissibility of medical causation testimony, which requires a plaintiff to show a cause is "more likely than not" and not just a "possibility." *Id.* at PageID 1829-30. Second, because Dr. Laboy thought heat stroke was only "probable," the district court held that his opinion was speculative and would not assist the jury in finding a fact in issue. *Id.* at PageID 1830. Third, the district court held that Dr. Laboy's methodology was flawed because his opinion of the cause of death was "based solely on the environmental conditions in which [Mr. Johnson's] body was found." *Id.* at PageID 1831. In other words, Dr. Laboy assumed "before the autopsy even began" that "heat stroke was the cause of [Mr.] Johnson's death." *Id.* at 1830-31.

Next, the district court held that Dr. Laboy "fail[ed] to meaningfully consider alternative causes of death" because he concluded that Mr. Johnson had "no significant past medical history," without first receiving and reviewing Mr. Johnson's full medical records from his primary care physician, Dr. Geater. *Id.* at PageID 1831-32. The district court noted that Dr. Geater's medical records contained additional information which Dr. Laboy did not consider, including the results of lab tests performed on Mr. Johnson in May of 2011, with several values noted as being outside the normal reference range. *Id.* at PageID 1832.

Finally, the district court held that Dr. Laboy's methods did not comport with the Sixth Circuit's differential diagnosis standard because "he failed to analyze or rule out any alternate causes [of Mr. Johnson's death]." *Id.* at PageID 1832-33. Thus, the district court concluded that Dr. Laboy's opinion was "speculative," "based on unreliable methodology," and therefore "must be excluded." *Id.* at PageID 1833.

Plaintiffs then filed a motion asking the court to set aside its order, and seeking leave to respond to the motion to exclude. R. 120. The district court granted the motion, R. 121, and Plaintiffs filed a response, R. 122. For the same reasons it stated in its first opinion, the district court granted Defendant's second motion to exclude. R. 126. The district court further expounded on Dr. Laboy's methodology, finding it unreliable because "he did not explain why cardiac arrest was not the sole cause of death, and thus he did not 'reliably rule out' cardiac arrest." *Id.* at PageID 1909-10. Because Dr. Laboy did not adequately explain why Mr. Johnson allegedly died of heat stroke, the district court concluded that this opinion was speculative and unreliable, and therefore must be excluded. *Id.* at PageID 1915.

Defendant then moved for summary judgment, arguing that without Dr. Laboy's testimony, Plaintiffs could not prove causation. R. 127. In their response, Plaintiffs conceded this point, R. 131, but also moved for the court to revisit its order excluding Dr. Laboy's testimony, R. 130. Included with the latter motion was an affidavit from Dr. Laboy explaining precisely what his professional medical opinion of "probable heat stroke" meant: "Probable was not intended to mean the same as possible, perhaps, or maybe. Probable means 'reasonable to think,' 'more likely than not.'" R. 130-2, PageID 1964. Dr. Laboy also stated that his autopsy and toxicology reports are admissible in Tennessee court proceedings, citing Tenn. Code. Ann. 38-7-110(a) and (c). *Id.* at PageID 1964.

The district court denied Plaintiffs' motion as failing to meet the requirements of Local Rule 7.3, which precludes reconsideration of orders based on evidence and arguments that were previously available but not raised—specifically Dr. Laboy's affidavit. R. 134, PageID 2028-29, 2033. Nonetheless, the district court still considered the merits of the issues raised in Dr. Laboy's affidavit. It held that Tenn. Code. Ann. 38-7-110 applies only in proceedings in Tennessee state

courts.[5] *Id.* at PageID 2031. Furthermore, it held that Dr. Laboy could not now cure the previous uncertainty of his opinion by the mere incantation of the magic words, "reasonable degree of medical certainty." *Id.* at PageID 2032-33. Consequently, because Plaintiffs could not prevail on their cause of action without Dr. Laboy's testimony, the district court granted Defendant's motion for summary judgment. *Id.* at PageID 2034.

Plaintiffs appeal the district court's rulings excluding Dr. Laboy's testimony, as well as the related grant of summary judgment to Defendant.

**II.**

We review a district court's exclusion of expert testimony for abuse of discretion. *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005)).

For expert testimony to be admitted under Rule 702,[6] the district court, in its role as "gatekeeper," must determine that such evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Therefore, the district court determines not whether the proffered opinion is correct, but rather whether the methodology used in reaching that opinion is sound. *Id.* at 595.

---

[5] Because we conclude that Dr. Laboy's testimony is admissible under *Daubert*, we do not consider whether, contrary to the district court's ruling, his report would likewise be admissible in this federal proceeding premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

[6] Fed. R. Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

**A.**

First, Plaintiffs challenge the district court's conclusion that Dr. Laboy's opinion was speculative—and therefore unable to assist the trier of fact—because it was not expressed to the requisite degree of medical certainty. Specifically, the district court equated Dr. Laboy's use of the term "probable" in his diagnosis of "probable heat stroke" with the word possible, and therefore held that it did not mean "more likely than not." R. 119, PageID 1830; R. 126, PageID 1907-08.

For starters, the meaning of the phrase "reasonable degree of medical certainty" is by no means itself a legal or medical certainty. Although routinely used by lawyers and judges, there is no consensus among judges, attorneys, or commentators as to the phrase's precise meaning— whether it be more probable than not, beyond a reasonable doubt, or somewhere in between. *See generally* Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty"*, 57 Md. L. Rev. 380 (1998). Correspondingly, courts have developed various tests. *See id.* However, the bottom line is that these are all *legal* tests. "The standards 'reasonable medical certainty' and 'reasonable medical probability' are [] terms of art *in the law* and have *no* analog for a practicing physician." Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 691 (3d ed. 2011) (emphasis added). In other words, Physicians speak their own language in carrying out their professional responsibilities.

Furthermore, and perhaps because of this, it is the long-standing rule of this circuit that for expert testimony to be admissible, there is no "magic words" test. *See Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir. 1969). That is, scientific experts need not attach the modifier "to a reasonable degree of medical certainty" to their opinions to gain admissibility. As this Court recently held, "the phrase ['with a reasonable degree of medical certainty']—the

conclusion by itself—does not make a causation opinion admissible. The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Nonetheless, the majority of courts require that an expert opinion express a probability, which is more than a mere possibility. *See, e.g.*, *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985) ("The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough . . . ." (quoting Prosser & Keeton, Torts, § 41, p. 269 (5th ed., 1984))); *see also Tamraz*, 620 F.3d at 671 ("No matter how good experts' credentials may be, they are not permitted to *speculate*.") (brackets and quotation marks omitted) (emphasis added).[7] A "probability" means more likely than not. *See Probability*, *Probable*, Black's Law Dictionary (6th ed. 1990). Thus, because a plaintiff need only prove causation by a preponderance, for an expert opinion to be helpful to the jury, a doctor need only testify that his conclusion is more likely than not true. *See Vandergriff v. Bituminous Cas. Corp.*,

---

[7] Although this circuit has not held for purely federal law purposes with what degree of certainty an expert must express his opinion for it to be admissible, all of the state courts within the Sixth Circuit have held that such opinions must express the expert's belief that a fact is probably true, and not just possibly true. *See White v. Leimbach* 959 N.E.2d 1033, 1040 (Ohio 2011) (stating that under Ohio law, a medical expert causation opinion "should be framed in terms of medical probability, not possibility."); *Seaton v. Rosenberg*, 573 S.W.2d 333, 338 (Ky. 1978) (stating that an expert is to "express[] his opinion as a probability or certainty, not a possibility, 'could have,' or the like."); *Knoper v. Burton*, 163 N.W.2d 453, 456 (Mich. Ct. App. 1968) *rev'd on other grounds*, 173 N.W.2d 202, 205 (Mich. 1970) ("For the testimony of Dr. Dye to be admissible he need not have testified in terms of reasonable medical certainty."); s*ee also, e.g.*, *Estate of Sanders v. United States*, 736 F.3d 430, 437 (5th Cir. 2013) (quoting the Mississippi Supreme Court that under Mississippi law, "expert opinion of a doctor as to causation must be expressed in terms of medical probabilities as opposed to possibilities"); *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 984 (8th Cir. 2010) (quoting the Nebraska Supreme Court that under Nebraska law, "[e]xpert testimony based on possibility or speculation is insufficient to establish causation; it must be stated as being at least 'probable,' in other words, more likely than not") (brackets and quotation marks omitted); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (holding that under federal law, "While expert opinions must be based on facts which enable the expert to express a *reasonably accurate* conclusion as opposed to conjecture or speculation, absolute certainty is not required.") (emphasis added) (brackets, quotation marks, and ellipsis omitted).

692 S.W.2d 20, 22 (Tenn. 1985); *see also Stinson v. England*, 633 N.E.2d 532, 537 (Ohio 1994) (holding that an expert opinion on causation "must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.").

Dr. Laboy's testimony satisfies this standard. At his deposition, defense counsel asked Dr. Laboy what he meant by "probable" in the "probable heat stroke" diagnosis he gave in his autopsy report:

> Q: What does "probable" mean?
> A: Probable mean that is after reviewing everything there's no other thing that I can attribute the cause of death. And with all the circumstances and evidence at the time, level of histology, I did not find an explainable cause of death for this case.
> Q: You did not find –
> A: Other natural – explain the death other than the probable heat stroke.
> Q: Is that called a diagnosis of exclusion? Are you familiar with the term.
> A: Yes. It's not like a – when you're doing a differential and doing exclusions because over here I deal with the evidence that I have. Probable heat stroke is when someone has raising temperature that the body cannot handle any more. To actually call it ["heat stroke"], you have to get the [body's] temperature. *So it's something that is documented in the hospital when you get a reading when the person is still alive. The fact that I don't have that, that's why I say probable.*

R. 112-1, PageID 1757 (emphasis added).

Dr. Laboy's testimony makes clear that heat stoke was not a hypothesis. That is, Dr. Laboy was not speculating whether Mr. Johnson died of heat stroke. "Probable heat stroke" was the diagnosis, not a description of Dr. Laboy's certainty of the diagnosis. Therefore, when Dr. Laboy was later asked at the same deposition, "And in your opinion can you tell me whether to a reasonable degree of medical certainty that this death was due to a heat stroke?" R. 112-1, PageID 1809, and Dr. Laboy responded without qualification, "In my professional opinion it's probable heat stroke and the manner is an accident," *id.*, he in essence is saying is that it is his

opinion as a doctor and a pathologist that it is at least more likely than not that what Mr. Johnson died of was "probable heat stroke." This suffices.

Therefore we turn now to whether Dr. Laboy's method in reaching his conclusion was reliable.[8]

**B.**

Plaintiffs also challenge the district court's conclusion that Dr. Laboy's differential diagnosis was unreliable, and therefore excludable. *See* R. 119, PageID 1830; R. 126, PageID 1909; R. 134, PageID 2033. A "differential diagnosis" or a "diagnosis of exclusion" is "[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Best*, 563 F.3d at 178 (quoting Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 214 (1994)). In the Sixth Circuit, for a differential diagnosis to be reliable under *Daubert*, the doctor must: (1) objectively ascertain, to the extent possible, the nature of the patient's injury or cause of death; (2) rule in one or more causes—or etiologies—of the injury or cause of death using a valid methodology; and (3) rule out alternative causes, using standard diagnostic techniques, to arrive at a conclusion as to which cause is most likely. *Best*, 563 F.3d at 179. Regarding the third

---

[8] As an aside, we find inexplicable the district court's contradictory holdings across its opinions regarding the requisite standard of certitude for expert testimony. In its first two opinions excluding Dr. Laboy's testimony, the district court faults Dr. Laboy's opinion as speculative for not stating his opinion with the requisite certitude. R. 119, PageID 1829-30; R. 126, PageID 1907. Then in its third opinion, after Dr. Laboy spells out explicitly that he is sufficiently sure of his diagnosis, and evidences passages from his deposition testimony showing that he expressed the same level of certitude when he gave that testimony, the district court dismisses the whole topic, stating that there is no magic words test, Dr. Laboy's *ipse dixit* does not make his opinion non-speculative, and Dr. Laboy's opinion is still inadmissible. Although Dr. Laboy's opinion may certainly be inadmissible for other reasons, e.g., unreliability, the district court must at least be consistent as to whether Dr. Laboy's testimony is inadmissible for failing to be expressed with sufficient certainty. As a matter of logic, Dr. Laboy's opinion cannot be inadmissible for failing to meet the standard one moment, *and* then still inadmissible for meeting that same standard the next. *See* Aristotle, *Metaphysics* IV.3 (1005b19-20) ("It is impossible for the same thing to belong and not to belong at the same time to the same thing and in the same respect.").

prong, the doctor must provide a reasonable explanation as to why he concludes that alternative causes suggested by the defense were not the sole cause of the injury or cause of death. *Id.*

**1.**

Defendant does not object to the objectivity of the means Dr. Laboy used in ascertaining Mr. Johnson's cause of death. Dr. Laboy performed a routine autopsy on August 5, 2011, in the discharge of his legal duties under Tennessee law. In conjunction with the results of a standard autopsy, Dr. Laboy also relied on the medical history sent to him by Dr. Geater,[9] the results of the post-mortem toxicology report, the vitreous electrolyte panel, data provided by the National Oceanic and Atmospheric Administration regarding the heat and humidity conditions in Memphis for the day of Mr. Johnson's death and the several preceding days and the temperature and humidity recorded by investigators when they collected Mr. Johnson's body. These are all objective means, and therefore, *Best*'s first prong is met. *See Best*, 563 F.3d at 179.

**2.**

Dr. Laboy also meets *Best*'s second prong, by reliably ruling in possible causes of death. In an effort to find the cause of an unexplained death, Dr. Laboy did what medical examiners typically do: he examined the entire body inside and out, looking for possible causes of death. As detailed in his autopsy report, first Dr. Laboy conducted an external examination of Mr. Johnson's body, looking for external causes of death—e.g., a bullet wound or stabbing—and found none. R. 111-4, PageID 1658. He next looked for internal causes of death. Dr. Laboy examined Mr. Johnson's organs and found no trauma or abnormalities with his head, neck, chest and abdomen, gastrointestinal tract, liver and gall bladder, spleen, pancreas, adrenal glands,

---

[9] Defendant claims that Dr. Laboy used Mr. Johnson's incomplete medical history. *See* Appellee's Br. 14-15. However, this objection does not go to the objectivity of Dr. Laboy's method, but rather to whether Dr. Laboy sufficiently ruled out other causes by taking account of all relevant factors. Consequently, this objection is dealt with in Part II.B.3, *infra*.

urinary tract, reproductive system, and musculoskeletal system. *Id.* at PageID 1659-61. However Dr. Laboy did find congestion in the lungs, and mild coronary artery disease in the heart. *Id.* at 1659. Otherwise, the heart was healthy, weighing in at 430 grams, and having normally thick walls. *Id.* After summarizing these findings, Dr. Laboy considered the environmental causes of death, namely the conditions in which Mr. Johnson's body was found. *Id.* at PageID 1661. He further reported that no medical history was yet available to him, and the negative toxicology report was only preliminary. *See id.* Dr. Laboy concluded that "In my opinion, this death resulted from probable heat stroke." *Id.* at PageID 1661. Although he signed a death certificate for Mr. Johnson that same day, because he was still awaiting further toxicology analysis, the results from an electrolyte and glucose panel, and medical records, he put down the cause of death on the death certificate as "pending." R. 72-3, PageID 1155-56.

On August 9, 2011, Dr. Laboy received Mr. Johnson's medical records from his primary care physician, Dr. Geater. R. 72-6, PageID 1268-88. On August 15, 2011, Dr. Laboy received the final toxicology report, which reported no positive findings. R. 72-3, PageID 1135-37. On August 19, 2011, Dr. Laboy received the electrolyte and glucose (i.e., vitreous fluid) panel indicating dehydration from heat and profuse sweating: sodium levels of 120 mmol/L; potassium levels of 17 mmol/L; chloride levels of 100 mmol/L; urea nitrogen levels of 55 mg/dl; and creatine levels of 2.4 mg/dL. R. 112-1, PageID 1761; R. 72-3, PageID 1132-34. Only after Dr. Laboy examined and reviewed all of this evidence did he sign the delayed death certificate on August 19, 2011, confirming probable heat stroke as the cause of death. R. 72-3, PageID 1154.

In his deposition testimony, Dr. Laboy confirmed all of this, and explained his reasoning process. After examining the body head to toe, inside and out, removing Mr. Johnson's heart, examining it, and finding it to be within normal weight, R. 112-1, PageID 1750-57, Dr. Laboy

found no overt cause of death, e.g., a bullet wound, or a lethal case of coronary disease, *id.* at PageID 1765. Dr. Laboy, then, considered: the correlation between heat stroke induced deaths and environments with high temperatures and humidity; the negative results of Mr. Johnson's toxicology analysis; that the numbers from Mr. Johnson's vitreous fluid panel report showed dehydration from heat and profuse sweating; the objective data provided by the National Oceanic and Atmospheric Administration of the heat and humidity conditions in Memphis for the day of Mr. Johnson's death and the several preceding days; the temperature and humidity recorded by investigators when they collected Mr. Johnson's body; the fact that some fresh air had circulated into Mr. Johnson's apartment in between the time Mr. Johnson was discovered dead and when the investigator's came; the fact that Mr. Johnson's apartment was secured, i.e., all closed in, at the time of death; the fact that Mr. Johnson had no access to utilities; and the lack of any relevant events or facts in his full medical history. *See* R. 112-1, PageID 1729-30, 1746, 1758, 1761, 1783, 1807-08. Based on these factors, and a lack of an overt cause of death, Dr. Laboy ruled in "probable heat stroke" as the cause of death. *Id.* at PageID 1757. This satisfies *Best*'s second prong. *See Best*, 563 F.3d at 179.

Significantly, Defendant does not claim that probable heat stroke *could not have been* the cause of death, or that his use of the National Oceanic and Atmospheric Administration's data was an unreliable methodology. Rather, Defendant argues, and the district court held, that Dr. Laboy simply assumed at the outset that heat stroke was the cause of death because of the environmental conditions in which Mr. Johnson's body was found. Appellee's Br. at 13; R. 119, PageID 1830-31; R. 126, PageID 1913. This, however, is based on a clearly erroneous reading of the record, as both the autopsy report and Dr. Laboy's testimony establish that he considered environmental causes of death *after* he failed to find another cause:

Q: So when it is 100 degrees plus in the city and a body comes in without an apparent cause of death, and I mean like a bullet wound or something like that, is it fair to say that your antenna is up that it may be heat related [and needs to be reported to the health department as such]?
A: If the circumstances are correct for it and the weather is, you know, on the season *and there's nothing in the autopsy that point me to a natural disease, yes*. In this case we – it's not an official report. It's something that it could be a case.
Q: Kind of a presumption that you're making that it is a heat-related death and then you go through the autopsy to see if there is anything that you find to suggest otherwise.
A: Yes.

R. 112-1, PageID 1777-78 (emphasis added). In short, Dr. Laboy took into account a relevant environmental condition and relied on it *after* he was unable to find another cause of death, not *before*.

Under the reasoning of the district court and Defendant, if Dr. Laboy was presented with a body for autopsy that had been pulled from the river, and knowing this Dr. Laboy was more attentive to the possibility of drowning, and conducted the autopsy with an eye toward confirming or denying that drowning was the cause of death, this would be error and an unreliable method. But this is ludicrous. To take account of a relevant fact—that Mr. Johnson's body was found in a secured room at 93.2 degrees Fahrenheit, and 63% humidity—is not an indicia of an unsound methodology, but the exact opposite. Had Dr. Laboy ignored this, *that* would have been an unreliable method for conducting an autopsy and a differential diagnosis, as it would have failed to account for an obviously significant and material fact. *Daubert*, 509 U.S. at 592-93 ("[T]he reasoning or methodology underlying the testimony [must be] scientifically valid . . . .").

**3.**

Dr. Laboy's autopsy report and testimony also demonstrate that he sufficiently ruled out alternative causes of death. First, Dr. Laboy ruled out external causes of death by examining the

body's exterior. R. 111-4, PageID 1658; R. 112-1, PageID 1765. Then he ruled out various diseases and conditions after examining the organs—the heart and lungs in particular—running a toxicology panel, a vitreous fluid panel, and considering Mr. Johnson's medical history. R. 111-4, PageID 1659-61; R. 112-1, PageID 1757.

Again, neither Defendant, nor the district court, fault Dr. Laboy's actual conclusions. Instead, the district court held that Dr. Laboy's methodology was faulty because "he did not explain why cardiac arrest was not the sole cause of death," or in other words, "he did not 'reliably rule out' cardiac arrest." [10] R. 126, PageID 1909-10. However, it is the district court whose reasoning is faulty.

Dr. Laboy's findings were consistent with sudden cardiac death. R. 112-1, PageID 1778. But, as Dr. Laboy explained in his deposition testimony, sudden cardiac death usually requires an etiology—i.e., an underlying cause of death. R. 112-1, PageID 1778. This is because "sudden cardiac death" describes a manner of death, but not the underlying cause of death. R. 112-1, PageID 1767, 1769 ("Sudden cardiac death is basically they can have an arrhythmia and die suddenly *due to multiple factors*.") (emphasis added). The lack of a beating heart is a feature of every dead body.

Furthermore, Dr. Laboy also testified that the vast majority of sudden cardiac death cases are accompanied by a known etiology, and only rarely is it idiopathic—of unknown cause. *Id.* at PageID 1793-94. Dr. Laboy identified the most common etiologies associated with sudden cardiac death as coronary artery disease, the thickening of the septum or an abnormally large

---

[10] Although not essential to our holding, it should be noted that the district court improperly identified "cardiac arrest" as the alternate cause of death that it thought Dr. Laboy should have "reliably rule[d] out," R. 126, PageID 1909-10, when in actuality, what Dr. Laboy and defense counsel discussed at deposition was "sudden cardiac death," *see e.g.*, R. 112-1, PageID 1778. "Cardiac arrest" merely means that someone's heart has stopped. Steadman's Medical Dictionary ¶ 63620, Westlaw (database updated Nov. 2014). This is a necessary feature of every death, in that if someone's heart were beating, they certainly would not be dead. It is not a cause of death itself.

heart. *Id.* Dr. Laboy ruled out *all* of these. Despite Mr. Johnson having mild coronary artery disease, R. 111-4, PageID 1657, he determined that it was not sufficient to be cause of death, *see* R. 112-1, PageID 1765. Dr. Laboy testified that the thickness of all of the walls of the heart were normal. *Id.* at PageID 1795-96. He also testified that despite being on the heavy side of the normal range, the heart's weight was still within normal limits. *Id.* at PageID 1754. Defendant does not suggest, let alone assert, that Dr. Laboy's diagnosis on this point is legally or medically flawed.

As this Court stated in *Best*, "[a]dmissibility under Rule 702 does not require perfect methodology," and "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible." 563 F.3d at 181. Rather, in ruling out alternatives, an expert need only do so to the extent necessary to "reach a conclusion as to which cause is *most likely*." *Id.* at 179 (emphasis added). Thus, once a mostly likely cause has been identified using a sufficiently reliable methodology, "[a]ny weaknesses in . . . methodology will affect the weight that . . . opinion is given at trial, but not its threshold admissibility." *Id.* (finding plaintiff's expert's differential diagnosis reliable in ruling out nine of ten other potential causes for plaintiff's anosmia).

In fact, Dr. Laboy considered all relevant factors, ruled in probable heat stroke, and ruled out all other potential etiologies, including sudden cardiac death. Thus, based on a sufficiently reliable methodology, Dr. Laboy determined that probable heat stroke was the most likely cause of death. Consequently, Dr. Laboy's opinion is admissible, and any suggestion by Defendant of an alternative cause of death, or a weakness in Dr. Laboy's methodology, goes to the weight of Dr. Laboy's testimony, not its admissibility. *See Best*, 563 F.3d at 179.

Although the district court cited it in support, *Bailey v. United States*, 115 F. Supp. 3d 882 (N.D. Ohio 2015) actually bolsters our conclusion today. There the mother of a deceased Army recruit sued her son's recruiters and the United States for wrongful death, alleging they "negligently caused her son's death by instructing him to use dangerous weight-loss methods to meet Army enlistment standards." *Id.* at 886. The plaintiff's proposed expert, Dr. Noftz, intended to testify that the decedent's cardiac dysrhythmia, which caused his death, was due to an electrolyte imbalance caused by the weight-loss routine the decedent was engaged in to meet enlistment standards. *Id.* at 888. However, the court found that Dr. Noftz's differential diagnosis was unreliable because he failed to rule out "possible cardiac and non-cardiac causes of death unrelated to [the decedent's] diet and exercise regime." *Id.* at 892. As the court pointed out, "Dr. Noftz himself testified that it was impossible to rule out many common causes of sudden cardiac death without an autopsy or premortem blood analysis," both of which were absent in that case. *Id.* Further, Dr. Noftz testified that to determine the cause of death it would be very important for him to know the decedent's activities in the forty-eight hours preceding death, and that he did not know these facts. *Id.*

Dr. Laboy did here what Dr. Noftz failed to do in *Bailey*. Dr. Laboy ruled out the common causes of sudden cardiac death by conducting an autopsy, performing toxicology tests, running a vitreous fluid panel, and considering relevant environmental factors just prior to death. Dr. Laboy's opinion, unlike that of Dr. Noftz, was not based on a "likely scenario," and therefore did not constitute a speculative and merely "working hypothesis," and was, therefore, reliable. *Id.* at 892-93.

Last, as Plaintiffs correctly point out, the district court also erroneously held that Dr. Laboy's method of ruling out other causes was flawed because he failed to consider all relevant

medical history. As detailed above, Dr. Laboy did not sign the delayed death certificate, nor confirm his preliminary diagnosis of probable heat stroke until after Dr. Geater sent him Mr. Johnson's *full* medical record, and he reviewed it. *See* R. 112-1, PageID 1743, 1782-83. Therefore, Defendant's argument, and the district court's holding, on this point are based on a clearly erroneous reading of the record.

For all these reasons, we reverse the exclusion of Dr. Laboy's testimony.[11] Any perceived weaknesses in Dr. Laboy's method or his testimony may be challenged at trial; however, they do not make his testimony inadmissible.

## III.

We review summary judgment de novo. *Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 912 (6th Cir. 2013). Summary judgment is only appropriate where, construing the facts in a light most favorable to the non-movant, there are no disputed issues of material fact. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017).

Because we hold that Dr. Laboy's testimony regarding Mr. Johnson's cause of death admissible under Fed. R. Evid. 702, a question of material fact is in dispute, and therefore summary judgment is inappropriate.

---

[11] Because we hold that Dr. Laboy's expert opinion is admissible based on his autopsy report and deposition testimony, it is not necessary for us to consider Plaintiffs' claim that the district court erred in denying their motion for revision of the order excluding Dr. Laboy. The district court denied the motion pursuant to Local Rule 7.3 because it perceived Dr. Laboy's affidavit as "new evidence" that could have been obtained prior to the filing of dispositive motions. *See* R. 134, PageID 2032. We do not read Dr. Laboy's affidavit in the same way. Rather, we perceive it as an attempt to correct the district court's erroneous reading of Dr. Laboy's autopsy report and deposition testimony, in which Dr. Laboy clearly diagnosed the cause of death as "probable heat stroke" to a reasonable degree of medical certainty.

**IV.**

For the reasons stated above, we **REVERSE** the district court and **REMAND** for further proceedings consistent with this opinion.

ALICE M. BATCHELDER, Circuit Judge, dissenting. Unlike Memphis Light, Gas & Water's ("MLGW") absurd proof-of-identity policy in 2010, the district court's decision to exclude Dr. Laboy's testimony was sound and reasonable. I would affirm it and the grant of summary judgment to MLGW.

Under the abuse-of-discretion standard that governs our review of district courts' decisions to exclude expert testimony, we should not reverse unless we are "firmly convinced that a mistake has been made." *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 980 (6th Cir. 2004) (citation omitted). I am not firmly convinced that the district court erred by excluding Dr. Laboy's testimony. The record supports the district court's finding that Dr. Laboy's testimony failed our test for reliability under Rule 702, as outlined in *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178–79 (6th Cir. 2009). As the district court noted, Dr. Laboy presumed that Johnson's death was heat related. Dr. Laboy did not establish the way by which he ruled out other possible causes of Johnson's death, including Johnson's enlarged heart (cardiomegaly), his extremely low Vitamin D levels, and his smoking history and possibly related physiological symptoms (*e.g.,* the several brown pigmented macrophages in Johnson's lungs). Given that Johnson had several risk factors for sudden cardiac arrest, Dr. Laboy's mere assertion that he considered all possible causes of death does not pass muster under *Daubert* or Rule 702. Further supporting my conclusion that the district court did not err by excluding Dr. Laboy's testimony is the doctor's own statement that he "*did not find an explainable cause of death for this case*." To simply attribute death to heat stroke when one cannot find an explainable cause of death seems questionable from a medical standpoint, and surely inadmissible from a legal one.

For the above-mentioned reasons, I do not believe that the district court abused its discretion by excluding Dr. Laboy's medical expert testimony. Because "Appellants agree that they cannot prove an essential element of their claim without the testimony of Dr. [] Laboy," the district court did not err by granting MLGW a summary judgment. My colleagues having reached the opposite conclusion, I respectfully dissent.